This is the case involving the policeman and the sham seizure of drugs, says the government. Could you maybe move the microphone up a bit so that we can hear you better? The room has poor acoustics. No, I don't think that one is the one. Maybe she'll just turn you up. Is that? Okay. May I start again? I apologize. You may get your full time back and start again. Thank you, Your Honor. May it please the Court, I'm Larry Warner. I represent the appellant. You know, on the way to the Court today, I looked over a book I'd gotten before called Great Trials of History. And I was shocked to find that in some systems, the judge is also the prosecutor. I thought, well, you can't do that. Well, one of the points that I want to discuss with you this morning is, these are words from one of the four cases I want to talk to you about. Did the judge assume the prosecution mantle? I have a special request. Would you please look, before you make up your minds, at pages 13 through 27 of our reply brief? I set out every—well, the word that they use in Singer and in Donato and in Van Dyke is numerous. So they didn't tell me how many times the judge intervened in those cases, but they reversed it because they said, well, the judge assumed the prosecution mantle. Please look at pages 13 through 27 of our reply brief, where I quote every instance where the judge, without the intervention of the prosecutor, voices the objection and then sustains his own objection. And this is really important. They say, look, you need to look at this, please, members of the Court of Appeals. We're supposed to look at this, they say, from the standpoint of the jury. What are they going to think? And the standard— The judge is entitled to make evidentiary rulings. And why does—if he thinks it's an invalid objection and can be overruled, why does he need to wait for the other side to give its story? Thank you for that observation. The answer is, after a while, it becomes the appearance of preference for one side or the other. What's the most troubling comment? The most troubling comment, thank you, Your Honor, is the judge says there's an objection, and the lawyer for the defense says it's hearsay. And then he says, would you please ask the government to explain why they want this evidence in?  And you have to read between the lines, but the judge says there's your ruling. You're asking the government to respond to the objection. I just—I really don't— But they don't. I don't see it. I mean, in federal court, a judge, a district judge can ask questions. True. He can examine a witness. A federal district judge can even comment on the evidence. Yes, that's true. And this gets nowhere close to that. Well, I think if you look at all the instances that we point out to you on pages 13 through 27 of our reply brief, perhaps I'll be able to persuade you otherwise. If you look at Singer, you have to read between the lines on this comment, there's your ruling, and wonder whether or not that shows a high degree of preference for one side or the other. In Singer, the lawyer says, I have a great deal of respect for you, Your Honor. And the judge says, oh, you're just brimming with it. Well, that's just the cold, hard record. You've got to figure out what the tone of voice was. But if it shows a high degree of preference for one side or the other, then there's a point at which he just didn't get a fair trial. I'd like to discuss four cases with you. Were any of these things objected to? No, Your Honor. I know it's difficult in that certain circumstance if you believe the court is not being to stand up and voice an objection. But there were no objections made. No, Your Honor, there were not. But in Donato, Van Dyke, Singer, and Hickman, all cited in our brief, there's not an objection. Nobody says, Your Honor, you're upset, you're taking on the prosecution now. Nobody objects. What happens in Donato, Van Dyke, Singer, and Hickman, in each one of those cases, the court of appeals just says, well, we've looked at it, and it looks like a high degree of preference for one side or the other, and we just don't think he had a fair trial. And they only cite, in each one of those cases, they cite maybe four instances. Well, I've given you 24. Please look at them before you finally make up your mind. I'll stop any time you want. Let me look at each one of these cases, and I'll give you a cite, chapter and verse, to the record in this case. Yes, sir. So because the district judge explained why he thought certain questions weren't eliciting hearsay but were not for the truth of the matter and explained why, I mean, how does that show a preference for one side? That's the judge's job. He does it without an objection from the prosecutor on many occasions. And I suggest to you that at least – What do you mean an objection? I thought the defense objected, and he overrules it and explains why without sometimes needing the prosecutor to respond. The prosecutor doesn't even need to be there. It's just a fish, and you've got a jury there. You're trying to move the case. If you think it's a meritless objection, why do you need to have this lengthy back and forth? I just – all right. This is like in Singer, Your Honor. In Singer, the prosecutor doesn't know what to say, so the judge says, Have you thought about – it's repetitive. And the prosecutor says, Repetitive. And the judge says, Sustained. In our case, the same sort of thing happens more than once. The judge says, Relevance. And the prosecutor says, Relevance. And he says, Sustained. Now, if you look at that from the standpoint of the jury, what are they going to think? That the judge favors – What should he have done? Waited for the prosecutor to make a – not a single objection is other than a general objection. All the prosecutor ever says is objection, unless the judge feeds him the objection and says relevance, and then the prosecutor repeats what the judge has told him. From the standpoint of the jury, how is that going to look? Aren't the members of a lay jury – not magistrates on a court of appeals, but how are members of a jury going to see that when the judge is telling the prosecutor what to say and then sustaining the objection? I think it shows, if you look at pages 13 through 27 of our reply brief, that it shows what these four cases call a high degree of preference for one side or the other that effectively deprives him of the Sixth Amendment right to a fair trial. How do you reconcile that with, as Judge Costa was asking earlier, the wide breadth of authority that the district court has where, as my understanding, the district court can say, I didn't believe a word out of that witness's mouth. You can believe them if you want to, but I'll just tell you I don't believe that witness. To me, that seems much more putting their thumb on the scale of the testimony and with the case than what you're describing about relevance, sustained, overruled, that sort of thing. So why is – tell me why this is different than that. Combined with all the instances. This happens in Singer and in Van Dyck and in Donato and in Hickman. There is one where they say, well, yeah, he kind of told the jury what he thought about what the witness was saying in the one that's the bank embezzlement case. That's Singer. And they say, we know. Yes, it's true. Federal judges do get to comment on the weight of the evidence. They even get to tell the jury what they think. But this was so extraordinary that we think he just didn't get a fair trial. So the answer is, combined with that sort of comment from a judge, with all the other things that happened, he just didn't get a fair trial. Let me go on. I'll stop any time you want. Discuss any issue you wish. Your time is your time. I understand that. Thank you. I'd like to go on to the second issue that I'd like to discuss with you. After pointing out that the second issue is whether or not the trial judge committed reversible error when he lets in over a hearsay objection, there's this policeman. Members of the Court, there's this policeman. He's on the stand. And the policeman says, Elizabeth Cole, the lab technician, who, by the way, is not here and doesn't testify and never gets cross-examined, Elizabeth Cole told me, the policeman, that the weight of the substance did not match the weight that was submitted to the lab, didn't match the weight of the substance on the DEA 7 form. And the defense lawyer says . . . I do have a concern that that is a hearsay statement, that it was being offered for the truth. But explain to me why did the weight issue hurt you? Just assume, for argument's sake, that it was hearsay, it was being offered for the truth. How did the discrepancy in the weight of the drugs between the two weighings hurt your client? The prosecution's theory was they're the real drugs. My client and others steal the real drugs. And cut it and then put the pancake mix in to try to get it back to the same weight, right? But the lab to which it was submitted measured it for not only weight but also for purity. So what she was talking about, what the policeman was telling us about Elizabeth Cole's testimony, is that the substance gets reduced from 80 percent to 18 percent, which advances the prosecution's theory that my client and others stole the real drugs and substituted . . . They used some chemical term. I took general science instead of chemistry, so I could get out of high school. Some substance that starts with an I. I see how the purity hurts your client because the fact that he took the cocaine, separated some out, kept it, and then put in pancake batter, that's going to reduce the purity. So I see how that hurts you. But the testimony is actually about weight, not purity, isn't it? So I don't see why . . . And there was this discrepancy, right, between like 18 kilos and 16. But I don't see how the weight discrepancy . . . Because all the weighings, I think, were after your client cut the cocaine. So they said. And the jury found it. Right. And the judge agreed. So how does the weight discrepancy, as opposed to a purity problem, hurt your client? I think she was talking about the substance rather than the entire weight. But there's another point that . . . She wasn't talking about anything. She didn't testify. True enough. And I reread Crawford. But what he says, what the witness says is, Elizabeth Cole saying that the weight that was on our DEA form did not match the weight of the actual brick. So I'm having trouble. Again, I see the purity issue. I don't see the weight. I'm glad you see the purity issue because . . . But no one said anything about purity.  In one of the instances, they object to the testimony that the over-objection . . . Well, wait a minute. Why is this material getting sent to the DEA lab instead of the DPS lab? The state lab only tests for weight. And the DEA lab tests for purity. And the judge himself asks, well, isn't this beyond the protocol and isn't that why they sent it to the DEA lab? So that they could test it for purity. So here's the judge in a case in which the prosecution says, look, this policeman knew that the state lab was not going to test for weight. For anything more than weight. And that's why he sent it to the state lab. So it would only be tested for weight. And then later on, when they're doing the investigation, they send it to the DEA lab and they test it for purity and say it's not 80%, it's 18%. The judge's comment, that's under a different point, advances the prosecution's theory that the defendants, including my client, stole the real drugs and substituted the fake drugs. So the judge's comment, it's one of the ones between pages 13 and 27 of our reply brief. The judge's comment advances the prosecution's theory. You're right, Judge Elrond. Of course, in federal court, the judge can comment on the weight of the evidence. But considered with all the other things that happened in this case, like the prosecutor never, never, never even making anything other than a general objection, and most of the time the judge making the objections and ruling on himself, I just suggest that's like what we saw in Singer and Donato and Van Dyck and Hickman. I got your point about Elizabeth Cole. I reread Crawford. They say that the only indicium, the only indicator of finding the real truth is cross-examination. I understand about the weight, but she didn't testify. And the policeman's testimony did advance the theory of the prosecution. You're not making a constitutional argument. You didn't make that in your brief, right? I would say, you know what, in Crawford, Your Honor, they go through a lengthy discussion. There's a confrontation objection in Crawford. In your brief, is there a confrontation argument? Not what was in Crawford, but in your brief. You know, when you read Crawford, they talk about two different kinds of hearsay, and then they say, then they decide the case on constitutional grounds based on their distinction between two different kinds of hearsay. Yes. Crawford is a seminal case about confrontation. But my question to you, sir, and I think the answer must be no, is did you brief a constitutional issue in this case? I briefed hearsay because those were the authorities that supported my position. I've got another question. Yes, Your Honor. You've referred to pages 14 to 27 of your reply brief. 13, yes, sir. Okay. You've previously been warned by this court about remarkably poor briefing. I beg your pardon? Do I understand correctly, in United States v. Allen is warned about remarkably poor briefing. I'll just quote what this court said. Some of your arguments were based on significant misunderstandings or misrepresentations of the record, and that your arguments generally consisted of large block quotations and extensive transcript excerpts that were not even modified to remove the line numbers that appear in the transcript margins. And you were warned that if you do this again, you'll face sanctions. My question to you is do you believe that you have satisfied this court's previous warnings? I think so, Your Honor. I've tried to focus in on the two most important points that I saw in this case. So pages 14 through 27, in your view, do not violate this court's admonitions? Oh, it's 13 through 27, and it's my job. Whatever the page numbers are, you were asked not to simply provide large block quotations and extensive transcript excerpts that were not even modified to remove the line numbers. I think those large block quotations are indispensable to advancing my position that the judge intervened on numerous occasions. Numerous is the word that they use in Donato and Hickman for how many times the judge intervened. They didn't tell me how many, so I just showed you all of them that I could find. I thought that the large block quotations were absolutely indispensable to a point where there's no objection made by the trial counsel. Please accept my apology if you find my citation of large block quotations inappropriate, but I think they're indispensable if I'm going to tell you the trial judge intervened on too many occasions. You may or may not be right. My point is this court has issued a warning, and I'm just wondering if you believe that you've heeded that warning. I think I have, Your Honor. Thank you, Counsel. You've saved time for rebuttal. Thank you, Your Honor. May it please the Court, Richard Berry for the United States, Mr. Warner. If I could, I would essentially go backwards in order. The answer to Judge Elrod's last question is no, there is no constitutional order. It does look like it was hearsay, though. The objections were hearsay. No, I mean it actually seems like it probably was hearsay. Oh, the Elizabeth Cole comment that Judge Costa asked about? Yes, it does seem like it's hearsay, but tell me why it doesn't matter. The comment about Elizabeth Cole arguably is hearsay. The comment about the drug analysis may or may not be hearsay. It's completely irrelevant because the trial, as I set out in page 36 of the brief, there was a stipulation between the parties as to the weight of each of the 15 packets, the purity of each of the 15 packets, the aggregate purity, and the total weight. Basically from July 25th until 2012, until the trial, there were two different versions, what actually happened on the ground and then Mendez and the other crooked officer's version of the seizure. Mendez repeatedly overstated the seizures 18.9 kilos instead of 15 kilos. Carlos Gonzalez's testimony was unequivocal. He got the drugs from Salvador Gonzalez, I beg your pardon. He got the drugs from Carlos. He delivered them to Chapa, the crooked snitch. They were firm. They were uniform. You could stack them like Legos, and it was exactly 15 kilos of cocaine, greater than 80% purity because in the valley you can't sell anything less than 80%. When they were seized from the Ford Taurus, well, technically they were towed Saturday the 28th. When they were seized on Monday, July 30th from the Ford Taurus, it's 15 kilos of, I believe, 19.5% aggregate purity, 14.79 kilos of 19.5% aggregate purity, Mendez having removed approximately half the volume of the cocaine and substituted it with a diluting agent. I understand why the discrepancy on both purity and weight compared to what Gonzalez said he was dealing is an incriminating fact. What I don't understand is why the two weighings, as I understand it, both happened after the defendant had done his thing with the cocaine. So why is the two different weighings after that? I understand what he did caused the weight and purity to change, but why would there be two different weights after he cut the cocaine, and why is that incriminating? But I know that was part of the government's case. I'm trying to understand that. Because that's part of a fairly lengthy list of inconsistencies between what Hector Mendez did in this case and what should have happened in this case. You have to remember that Mendez and Officer Vela and Officer Lopez were all corrupted, and Chapa, the snitch. So there's a one weight at the DPS weighing and then one weight later in Dallas at the DEA lab. What did he have to do with that? Was there some fraud in connection with the— He was responsible. No, no, no. Mendez was responsible for the cover work that went with the cocaine. Well, let me back up just a second, if I may. Mendez was a Mission, Texas, police officer, but he was part of a federal drug task force in Mission and McAllen. As such, he was essentially working for the DEA. The DEA, as you undoubtedly know, has a lab in Dallas. DEA offices from all over the state send drugs to the DEA lab in Dallas and absolutely no place else unless there are unusual circumstances. What I still don't get is why the two labs found different weights. Mendez or somebody operating at Mendez's instruction prepared the paperwork that went with the drug shipment when it was sent to the DPS lab in West Lico. First, the drug should have immediately gone to Dallas. They sat in Mission for several months. Second, they should have gone to Dallas. Instead, they went to the DPS lab in West Lico. They sat in the DPS lab in West Lico for quite some time because the DPS looked at the cover sheet with the drugs and said 18.9 kilos, looked at the package and said less than 15. We're not going any further. In fact, they only went from the DPS lab in West Lico to the DEA lab in Dallas after one of the AUSAs in McAllen asked, what's going on with weighing the drugs, what's going on with the purity in drugs, and then discovered that they had gone to the DPS lab and said, why didn't they go to the DEA lab in Dallas? At that point, the DPS transferred them to the DEA. There was again a discrepancy with the paperwork. Mendez or someone working under him sent the correct paperwork to the DEA lab in Dallas and then the DEA analyzed it, which sort of segues back to your Elizabeth Cole question. Technically, that may have been hearsay, but I would respectfully submit that it was completely harmless because the parties stipulated the weight and the purity, which clearly indicated that both Gonzales and Chapa's testimony was correct and that Mendez had graduated from stealing marijuana to stealing and diluting seized cocaine, which is how Chapa and Mendez became so close. They started stealing both marijuana and currency from drug seizures and graduated to cocaine. In fact, they intended to graduate to a cocaine seizure before Gonzales came on the scene. Do you have any argument about the reply brief pages 13 through, all the instances that the opposing counsel believes that the district court weighed in inappropriately? Yes, Your Honor. There's a section in my brief dealing with, I believe it's issues 7 and 9. I did put one lengthy quote in where DEA supervisor champion is testifying and there's a couple of hearsay objections from defense counsel. Judge Crane says it's not offered for the truth. It's just offered to show that there was some irregularity in handling it. It doesn't matter whether it went to the DPS and then the DEA or the DEA and then the FBI. There was an irregularity, which was just one of many, many irregularities in the case. Defense counsel objected that he wanted an explanation from the prosecutor as to why the matter was, why the evidence was offered. Judge Crane volunteered precisely as Judge Costa said. It's not offered for its truth. It's just offered to explain that it's an irregularity. That's true. Defense counsel then said, you know, I'd like a ruling on my objection. And Judge Crane said, overrule, let's move on. As I said in the brief, it was essentially just the district judge saying, let's move on. This isn't that important. He obviously didn't say this isn't that important. When you look at the cases cited in my brief concerning improper comment from the district bench, there's absolutely nothing here that caused him to question the result of the trial or that would necessarily convey to the jury that the judge believed Mendez was guilty. Further, they were given the Fifth Circuit pattern instruction at the conclusion of the trial that they are the sole judges of credibility, that they should not infer anything whatsoever from what the district judge has said during the trial, and that they are the sole judges of facts. Given those instructions and given the context of that one comment coming as it did in a seven-day trial, I would respectfully submit that there was no error whatsoever. It was simply Judge Crane arguably, conceivably being a little irritated at the flow of the trial. I believe that was the first. All right. If the Court has any questions, I'd be delighted to address them. And if not, I'll just stand on what's in the brief. I think we have your argument, Counsel. Thank you very much, Judge Elrod. May I please the Court adjourn? Well, may I direct your attention, request your attention, if you please, to Issue No. 8, which we discussed earlier in opening argument, and that is the Court's overruling of an objection that the testimony was hearsay, which noted that the drugs had not been analyzed by the DEA lab. Here's the discourse. Once it was taken to the DPS, did it get analyzed at that point through the Department of Public Safety? The answer, it didn't. It took until the following year, June of 2013, when I believe that Officer Mendez was informed that it had not been analyzed. And then I was informed and believed, and the defense lawyer says, Your Honor, here's the objection. This is at page 1899 of our record. The trial judge reiterated the ruling. The defense lawyer says, Your Honor, I have a hearsay objection again. I mean, if it's not being offered for the truth of it, for the truth of the matter asserted, and the judge says overrule, the defense lawyer, why is it being offered? I'd ask the government to explain. The court, to explain why they sent it to another lab. The defense lawyer, I would ask the government to respond to my objection, at least, Your Honor, so that I can get a ruling. The court, overrule, that's your ruling. That's at page 1899. The government doesn't have to respond. The court can rule without the other side weighing in. I mean, isn't that right? The court can just know the answer and weigh in, just rule. The court can, of course. But I suggest to you, in response to your observation and opening argument, Judge Elrond, that the judge can even tell the jurors, I don't believe that witness. You all can believe me if you want to. That combined with all the things that are set out in our lengthy quotation, that it looks like Donato, it looks like Hickman, it looks like Singer, it looks like Van Dyke, where they just say, this shows a high degree of favoritism, and looking at it from the standpoint of the jury, they must have decided that the judge favored one side or the other, in this case the prosecution, and we just think that he didn't get a fair trial. Well, I'm sorry. I think this was offered for number eight, which is that hearsay is somehow reversible error. Did you want to – I didn't mean to get you far afield from that. Well, they kind of go together because the judge ruled on numerous hearsay objections, but his intervening in the process with comments left the jury with an impression that there was a high degree of favoritism for the prosecution, not as artfully done perhaps as it might have been done, but there is a – I do have to show you, if I say that he's not been – that he's assumed the prosecution mantle, the cases that I cited you to, Hickman and Donato and Van Dyke, they don't tell us how many you've got to tell them. They just say they were numerous, so I told you every one I could find, and one of them is this hearsay objection. Well, this advances the prosecution's theory. So just to be clear, your theory of violation here is when a district judge makes not one but numerous evidentiary rulings without waiting for the other side to respond. That is taking up the prosecution's mantle. That was the – I want to capture your theory. Thank you, Your Honor. Judge Ho, that's the analysis that they used in Singer. They used the word numerous. They just didn't tell me how many times that happened, and that's why I cited you to all of them that I could find in this record. With that, I'll ask you to consider, please, that there is a real case for the trial judge just to assume the prosecution mantle and the defendant just didn't have a fair trial. When you get to the hearsay objection that I just mentioned to you, I suggest that the judge's intervention there advances the prosecution's theory, and their theory was this person didn't send those things to the DEA lab because he knew they were going to be tested for purity and they'd find out that the substance that was submitted was 18% instead of 80%. So he sent them to the state lab where they only test for weight. So the judge's comment advanced the prosecution's theory. And for both of those reasons, thank you very much. I'll ask you to grant the defendant a new trial. Thank you for your time. Thank you, Counselor. May I submit a Rule 26-F letter today at 4 o'clock? Are you asking to submit a 28-J? I beg your pardon. I got the number wrong. On what basis? I think we have your argument. Very well. I think we briefed it, we heard it. Well, not as artfully as I might have done. I think we have your argument. Thank you.